[Cite as *State v. Rowe*, 2011-Ohio-5739.]

## IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## SENECA COUNTY

STATE OF OHIO,

    PLAINTIFF-APPELLEE,                CASE NO. 13-10-14

    v.

ERICA R. ROWE,                      O P I N I O N

    DEFENDANT-APPELLANT.

Appeal from Seneca County Common Pleas Court
Trial Court No. 09-CR-0150

**Judgment Affirmed**

**Date of Decision: November 7, 2011**

APPEARANCES:

    *Kent D. Nord* for Appellant

    *Derek W. Devine* for Appellee

**SHAW, J.**

{¶1} Appellant, Erica Rowe ("Rowe"), appeals the April 9, 2010 judgment of the Seneca County Court of Common Pleas, sentencing her to a prison term of thirty-five years to life for her convictions for complicity to murder, complicity to felonious assault, complicity to aggravated burglary and complicity to aggravated robbery.

{¶2} On November 2, 2008, in the early morning hours, eighty-year-old Frank Rios and his sixty-nine-year old wife, Bette Rios, were asleep in their bedroom on the main floor just off of the kitchen. Bette was awoken by the squeaking sound of the front door opening. The light from the stove cast the silhouette of a person, who Bette observed walking in the kitchen past the bedroom door. Bette whispered to her husband that someone was inside the house. At first, Frank told Bette she was just hearing things, but then he got out of bed to investigate.

{¶3} Frank walked to the frame of bedroom door, in between the kitchen and bedroom, when Bette heard him ask "What are you doing in here?" Almost immediately, Bette observed the intruder raise a weapon and strike her husband with enough force that the blow knocked him back onto the bed. Frank got off the bed and went after the intruder, who struck him again with the weapon. Frank did not move again after this subsequent blow. At this point, Bette was screaming.

The intruder then came around to the other side of the bed and began striking Bette with the weapon, making contact with her body several times. Bette attempted to hide under the bed as her attacker continued to hit her. Bette grabbed the weapon, which felt like a wooden baseball bat, but she was not strong enough to pull it out of the intruder's hands. During the course of the attack, Bette was struck with the weapon on her head, back, hands and arms. Bette recalled that she remained still with her body partially under the bed until the intruder eventually "gave-up" on her.

{¶4} Bette waited until it was quiet. She recalled that she did not hear any voices. The only sound she heard was Frank breathing very heavily. Bette then slid-out from under the bed, crawled over her husband who was lying on the ground and bleeding profusely, and called 9-1-1. Bette pulled the bed sheets over Frank, who was still unconscious, and waited for emergency response personnel to arrive.

{¶5} Frank Rios was taken to a hospital in Toledo by life flight. Bette was transported to Bellevue Hospital, where she was treated for multiple bruises and lacerations to her head, face, arms, and hands. The next day, Bette was released from the hospital and went to visit her husband at the hospital in Toledo. Frank Rios was still unconscious and had sustained multiple skull fractures. As a

result of the attack, his brain had become very swollen and emergency surgery was performed to relieve some of the pressure on his brain.

{¶6} When Bette arrived at the hospital, she was informed of Frank's situation; specifically that he had sustained a massive amount of brain damage. Bette subsequently consented to remove her husband from life support and he died shortly thereafter.

{¶7} When talking with Detective Kevin Reinbolt, the lead investigator on the case, Bette recalled some of the items missing from the house after the attack, such as her purse, her husband's wallet, which Bette thought contained $500.00 in cash, and her jewelry boxes. As time passed, Bette was better able to identify the specific pieces of jewelry missing. However, she was unable to definitively describe the person who attacked her and her husband. She could not recall any identifying characteristics—only that the person was of medium height and had a slender build.

{¶8} Rowe's name eventually came up in the course of the investigation of the case because she was in possession of Bette's wedding ring, which was believed to be stolen on the night of the home invasion. Rowe agreed to speak to law enforcement. Rowe claimed that Bette's ring was a gift from an ex-boyfriend and denied any involvement in Frank Rios' murder. Throughout the investigation, Rowe voluntarily spoke to law enforcement several times. Some of these

conversations took place at the police station and some took place at private residences. In one of these discussions, Rowe voluntarily turned over several more pieces of jewelry, claiming that she did not know where the items came from because they were given to her by several different people.

{¶9} On February 20, 2009, Rowe met with Det. Reinbolt at the Seneca County Sheriff's Office. The meeting was prompted by Rowe's Probation Officer at the time, who encouraged her to cooperate with law enforcement regarding any information she may have about the incident. Rowe arrived at the Sheriff's Office with her attorney, Charles Hall. Det. Reinbolt read Rowe her Miranda rights and gave her a copy of a waiver of her rights form, which she signed. Rowe then divulged the details of her involvement in the home invasion at the Rios' residence.

{¶10} Rowe admitted that at approximately 3:00 a.m. on November 2, 2008, she and her boyfriend at the time, P.S.,[1] drove to the Rios' residence to "pick-up" some prescription drugs. P.S. broke into the house while Rowe remained on the front porch. Rowe recalled hearing people arguing in the home, and then silence. According to Rowe, P.S. opened the front door and ordered her to, "Grab whatever you can." Rowe admitted that she then entered the Rios'

---

[1] Despite, the information Rowe gave to law enforcement concerning the home invasion and murder at the Rios residence, P.S. was never charged in connection with the incident. Therefore, we elect to use his initials when referring to Rowe's versions of events in this case.

bedroom and stole a jewelry box from the top of the headboard. However, Rowe denied any involvement in Frank Rios' murder. Rowe claimed that she did not know about the murder until a few days after the incident, when she read about the crime in the local paper.

{¶11} On July 15, 2009, Rowe was indicted by a Seneca County Grand Jury for the following offenses. Count One: complicity to murder, in violation of R.C. 2923.03(A)(2) and R.C. 2903.02(B), an unclassified felony; Count Two: complicity to felonious assault, in violation of R.C. 2923.03(A)(2) and R.C. 2903.11, a felony of the second degree; Count Three: complicity to aggravated burglary, in violation of R.C. 2923.03(A)(2) and R.C. 2911.11(A)(1), a felony of the first degree; and Count Four: complicity to aggravated robbery, in violation of R.C. 2923.03(A)(2) and R.C. 2911.01(A)(3), a felony of the first degree. Rowe subsequently entered a plea of not guilty to each of the charges.

{¶12} On March 4, 2010, Rowe filed a jury trial waiver, electing for her case to be tried by the bench. On April 5 and 6, 2010, the trial court conducted the trial of Rowe's case. Several witnesses testified, including Bette Rios, Rowe's mother, the coroner who conducted the autopsy of Frank Rios, and Det. Reinbolt. The trial court subsequently found Rowe guilty on all four counts listed in the indictment. On April 9, 2010, the trial court sentenced Rowe as follows. On Count One, complicity to murder, an indefinite term of fifteen years to life. On

Count Two, complicity to felonious assault, a prison term of eight years. On Count Three, complicity to aggravated burglary, a prison term of five years. Finally, on Count Four, complicity to aggravated robbery, a prison term of seven years. The trial court ordered each prison term to run consecutively for a total term of thirty-five years to life.

{¶13} Rowe subsequently filed her notice of appeal, asserting the following assignments of error.

## ASSIGNMENT OF ERROR NO. 1

**ERICA ROWE WAS DEPRIVED OF HER RIGHTS TO EFFECTIVE ASSISTANCE OF COUNSEL BY HER COURT-APPOINTED COUNSEL, IN CONTRAVENTION OF THE SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION, AND ARTICLE ONE, SECTION TEN OF THE OHIO CONSTITUTION, WHICH SEVERELY PREJUDICED THE RIGHTS OF APPELLANT AND DID NOT FURTHER THE ADMINISTRATION OF JUSTICE.**

## ASSIGNMENT OF ERROR NO. II

**THE TRIAL COURT ERRED WHEN DURING SENTENCING THE TRIAL COURT ORDERED THE DEFENDANT TO SERVE CONSECUTIVE TERMS FOR THE CONVICTIONS OF COMPLICITY TO AGGRAVATED BURGLARY AND COMPLICITY TO AGGRAVATED ROBBERY.**

## ASSIGNMENT OF ERROR NO. III

**THE CONVICTION IN THE TRIAL COURT SHOULD BE REVERSED BECAUSE IT IS AGAINST THE MANIFEST**

**WEIGHT OF THE EVIDENCE AND BECAUSE THE EVIDENCE SUPPORTING IT WAS INSUFFICIENT AS A MATTER OF LAW TO PROVE CONVICTION BEYOND A REASONABLE DOUBT.**

{¶14} For ease of discussion, we elect to address the assignments of error out of the order in which they are presented.

*First Assignment of Error*

{¶15} In her first assignment of error, Rowe maintains that she received ineffective assistance from her trial counsel, and that she was prejudiced as a result of her trial counsel's deficient performance.

{¶16} Initially, we note that attorneys licensed by the State of Ohio are presumed to provide competent representation. *State v. Hoffman* (1998), 129 Ohio App.3d 407, 717 N.E.2d 1149. To prevail on a claim of ineffective assistance of counsel, a defendant must prove that trial counsel's performance fell below objective standards of reasonable representation and that the defendant was prejudiced as a result. *Strickland v. Washington* (1984), 466 U.S. 668, 687; *State v. Bradley* (1989), 42 Ohio St.3d 136, 538 N.E.2d 373, paragraph two of the syllabus. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment. *Strickland*, 466 U.S. at 687.

{¶17} Also, in order to show that a defendant has been prejudiced by counsel's deficient performance, the defendant must prove that there exists a reasonable probability that, but for counsel's errors, the outcome at trial or in his legal proceedings would have been different. *Bradley*, 42 Ohio St. 3d at paragraph three of the syllabus. "Reasonable probability" is a probability sufficient to undermine confidence in the result. *Id.* at 142.

{¶18} When considering a claim of ineffective assistance of counsel, the court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689. Accordingly, courts are to afford a high level of deference to the performance of trial counsel. *Bradley,* 42 Ohio St.3d at 142.

{¶19} On appeal, Rowe maintains that her trial counsel was ineffective as a result of three specific errors: (1) Prior to being charged, Rowe voluntarily made incriminating statements to law enforcement based upon the false representations of her trial counsel that he had secured a plea bargain agreement with the prosecution; (2) Rowe waived her right to a trial by jury based upon the advice of her trial counsel. Rowe now contends that her chances of prevailing in her case were severely hampered by this decision; and (3) Rowe maintains that her trial counsel's performance was deficient because he failed to file a motion requesting DNA testing to be performed on the pants Rowe wore on the night of the home

invasion. Rowe claims the testing would prove that Frank Rios' DNA was not on her pants, and therefore, according to Rowe, would also prove that Rowe was not present in the home when the Rioses were attacked. [2]

{¶20} With respect to her first claim, Rowe argues that she only agreed to give a statement to Det. Reinbolt because her trial counsel had made certain representations to her that he had secured a plea offer and sentencing agreement from the prosecuting attorney. Notably, Rowe's incriminating statements were the only evidence the State had procured to place her at the scene of the crime. However, Rowe admits that the record is devoid of any evidence that her attorney arranged a deal with the prosecution. Moreover, also absent from the record is any evidence that Rowe's trial counsel made these specific representations to her. What the record does reflect is that Rowe made these statements to law enforcement voluntarily and prior to being charged in the case. In addition, the record demonstrates that Rowe later admits in an interview to law enforcement that she did not tell her trial counsel "all the dirty details" before she decided to give the incriminating interview. (Tr. Trans. p. 256).

{¶21} With regard to Rowe's third claim, Rowe maintains that based upon the advice of her trial counsel, she turned over to law enforcement the pants that

_____

[2] We acknowledge that Rowe attached an affidavit to her brief, averring to several of the facts that she claims provide a basis for her allegations of her trial counsel's deficient performance. However, this affidavit was not before the trial court or otherwise made a part of the trial record. Therefore, we cannot consider Rowe's affidavit as part of our review of the trial record.

she wore on the night in question. While Rowe contends that her trial counsel's performance was deficient because he failed file a motion to have the pants tested, the record is silent regarding any conversation Rowe had with her trial counsel regarding this issue. Even assuming *arguendo* that Rowe's claim is supported by the record, none of the parties dispute Rowe's contention that she was not in the Rios' home at the precise moment when Frank Rios was fatally beaten. Nevertheless, Detective Reinbolt testified at the trial that he sent all the clothing he received from Rowe for DNA testing.

{¶22} It is well-established that the alleged ineffective assistance of counsel must be apparent from the record on appeal. See *State v. Cooperrider* (1983), 4 Ohio St.3d 226, 228, 448 N.E.2d 452. Thus, "any allegations of ineffectiveness based on facts not appearing in the [trial] record should be reviewed through the postconviction remedies." *State v. Coleman*, 85 Ohio St.3d 129, 1999–Ohio–258, 707 N.E.2d 476, 483; see also *State v. Douthat,* 10th Dist. No. 09AP–870, 2010–Ohio–2225, ¶ 19; ("Where a claim of ineffective assistance of counsel is dependent upon facts outside the record, the appropriate remedy is for the defendant to file a petition for post-conviction relief."). Accordingly, because these particular allegations of ineffectiveness rely solely on facts outside of the record, they are not claims that can be considered on direct appeal.

{¶23} Rowe also contends that her trial counsel was ineffective in advising her to waive her right to a jury trial. We note that Rowe does not contend that her jury waiver was involuntary, unknowing, or unintelligent. But rather, she simply argues that she never should have been advised by her trial counsel to waive her right. Rowe now contends that the trial court's discussion with her on the record about the decision to enter a jury trial waiver somehow indicates that her trial counsel's advice rose to the level of ineffective assistance. In particular, Rowe imputes a new meaning into the trial court's colloquy and argues that the trial court was attempting to dissuade her from making the waiver by having a thorough discussion with her about the matter.

{¶24} At the hearing on her waiver of jury trial, the trial court held a lengthy and in-depth discussion with Rowe concerning her decision. While the record demonstrates that the trial court tried to impress upon Rowe the serious nature of her decision, there is no indication that the trial court was attempting to influence her decision in any manner. Rather, it is apparent that the trial court was simply ensuring that Rowe was making the waiver voluntarily, knowingly, and intelligently. To this end, Rowe demonstrated her proficient understanding of the different dynamics of being tried by the bench as opposed to a jury. She seemed particularly interested in the different outcomes of a jury verdict—specifically, with whether she would have to remain in jail if a mistrial were to be called by the

trial court or with whether the judge could overrule the jury's verdict. Even after the trial court explained these issues, Rowe remained steadfast in her decision to waive her right to a jury trial.

**{¶25}** Further, it has been held that "[d]ecisions regarding a jury waiver can be readily explained in terms of trial strategy." *State v. Peterson*, 10th Dist. No. 07AP303, 2008-Ohio-2838, at ¶ 56; see also *State v. Phillips* (1995), 74 Ohio St.3d 72, 85, 656 N.E.2d 643 (stating that debatable trial tactics generally do not constitute ineffective assistance of counsel). Rowe's trial counsel owed her a duty of giving her the benefit of his experience and advice. "The choice of whether to proceed with a jury trial or a bench trial is very often a matter of trial strategy, an area where an experienced attorney's advice should greatly benefit a client's interests. It is also an area where courts generally defer to trial counsel's judgment." *State v. Linehan* (Sept. 4, 1998), 2nd Dist. No. 16841, *6.

**{¶26}** Notably, the discussions between Rowe and her trial counsel regarding the jury waiver are not part of the record before us. Yet, again, Rowe asks this court to speculate without providing any evidence as to the content of these discussions and how they may or may not have impacted her decision-making process. Rowe simply makes the blanket assertion that waiving a trial by jury was error. Obviously, we cannot say as a matter of law that defendant's

choice to waive a jury trial based upon trial counsel's advice alone constitutes the basis for reversal on grounds of ineffective assistance of counsel.

{¶27} Based on the foregoing, we conclude that Rowe failed to provide any proof supported by the record that her trial counsel's performance fell below objective standards of reasonable representation and that she was prejudiced as a result. Therefore, Rowe's first assignment of error is overruled.

*Third Assignment of Error*

{¶28} In her third assignment of error, Rowe maintains that the record contained insufficient evidence to support her convictions for complicity to murder, complicity to felonious assault, complicity to aggravated burglary and complicity to aggravated robbery. Rowe further argues that her convictions were against the manifest weight of the evidence. Without providing a specific basis for her assertions, or any reference to the record, Rowe simply argues that "it is clear that there was no evidence presented to support [her] conviction[s]." We note that it is within our discretion to disregard assignments of error that fail to contain the reasons in support of the Appellant's contentions and citations to the record on which the Appellant relies. See App. R. 12(2) and 16(7). However, due to the serious nature of this case and in the interests of justice, we elect to address Rowe's assignment of error despite the fact that she failed to properly brief this matter.

{¶29} Reviewing a challenge to the sufficiency of the evidence requires this Court to examine the evidence in the light most favorable to the prosecution. The Ohio Supreme Court has set forth the sufficiency of the evidence test as follows:

> **[A]n appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial and determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.**

*State v. Jenks* (1991), 61 Ohio St.3d 259, 273, 574 N.E.2d 492, superseded by state constitutional amendment on other grounds as stated in *State v. Smith*, 80 Ohio St.3d 89, 684 N.E.2d 668.

{¶30} Unlike our review of the sufficiency of the evidence, an appellate court's function when reviewing the weight of the evidence is to determine whether the greater amount of credible evidence supports the verdict. *State v. Thompkins* (1997), 78 Ohio St.3d 380, 387, 678 N.E.2d 541. In reviewing whether the trial court's judgment was against the weight of the evidence, the appellate court sits as a "thirteenth juror" and examines the conflicting testimony. *Id*. In doing so, this Court must review the entire record, weigh the evidence and all of the reasonable inferences, consider the credibility of witnesses, and

determine whether in resolving conflicts in the evidence, the factfinder "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Andrews*, 3rd Dist. No. 1–05–70, 2006–Ohio–3764, ¶ 30, citing *State v. Martin* (1983), 20 Ohio App.3d 172, 175, 485 N.E.2d 717; *Thompkins*, 78 Ohio St.3d at 387.

**{¶31}** Rowe was convicted of complicity, in violation of R.C. 2923.03(A)(2), which provides:

> **(A) No person, acting with the kind of culpability required for the commission of an offense, shall do any of the following:**
>
> **(2) Aid or abet another in committing the offense;**

The indictment, which was the basis for Rowe's convictions for complicity, detailed the four underlying crimes as follows.

Count One, complicity to murder, in violation of R.C. 2903.02(B), which provides:

> **(B) No person shall cause the death of another as a proximate result of the offender's committing or attempting to commit an offense of violence that is a felony of the first or second degree and that is not a violation of section 2903.03 or 2903.04 of the Revised Code.**

Count Two, complicity to felonious assault, in violation of R.C. 2903.11, which provides, in relevant part:

> **(A) No person shall knowingly do either of the following:**

**(1)  Cause serious physical harm to another * * *;**

**(2)  Cause or attempt to cause physical harm to another * * * by means of a deadly weapon or dangerous ordnance.**

Count Three, complicity to aggravated burglary, in violation of R.C. 2911.11(A)(1), which provides:

**(A)  No person, by force, stealth, or deception, shall trespass in an occupied structure or in a separately secured or separately occupied portion of an occupied structure, when another person other than an accomplice of the offender is present, with purpose to commit in the structure or in the separately secured or separately occupied portion of the structure any criminal offense, if any of the following apply:**

**(1)  The offender inflicts, or attempts or threatens to inflict physical harm on another;**

Finally, Count Four, complicity to aggravated robbery, in violation of R.C. 2911.01(A)(3), which provides:

**(A)  No person, in attempting or committing a theft offense, as defined in section 2913.01 of the Revised Code, or in fleeing immediately after the attempt or offense, shall do any of the following:**

**(3)  Inflict, or attempt to inflict, serious physical harm on another.**

{¶32} The Supreme Court of Ohio has held that "to support a conviction for complicity by aiding and abetting pursuant to R.C. 2923.03(A)(2), the evidence must show that the defendant supported, assisted, encouraged, cooperated with, advised, or incited the principal in the commission of the crime,

and that the defendant shared the criminal intent of the principal. Such intent may be inferred from the circumstances surrounding the crime." *State v. Johnson*, 93 Ohio St. 3d 240, 245, 2001-Ohio-1336, 754 N.E.2d 796. "Evidence of aiding and abetting may be shown by either direct or circumstantial evidence, and participation in criminal intent may be inferred from presence, companionship, and conduct before and after the offense is committed." *State v. Gragg*, 173 Ohio App.3d 270, 278-279, 2007-Ohio-4731, ¶ 21, 878 N.E.2d 55.

{¶33} Rowe did not testify at her trial. However, in a statement she gave to law enforcement, the recording of which was played at trial, Rowe explained that she and her boyfriend at the time, P.S., decided at approximately 3:00 a.m. on the morning of November 2, 2008, to obtain Percocet pills from the Rios residence. Rowe claimed P.S. knew that Frank Rios had sold pills in the past. Rowe explained that she had a bad back and was complaining about her back that night, when P.S. suggested they try to find some pills. Rowe testified that P.S. did not take drugs and that the pills were solely for her consumption.

{¶34} Rowe left her six-month-old son with a friend at her apartment and borrowed the friend's truck. P.S. then drove to the Rios' country home on County Road 62. Rowe remembered that they parked the truck a block away from the Rios' house near some cornfields. Rowe claimed P.S. parked there because they could not find the driveway. Upon arriving at the house, Rowe recalled that P.S.

walked around to the back of the house. P.S. told Rowe to stand on the front porch and explained that he was going to unlock the front door for her.

{¶35} Rowe recalled that approximately five minutes passed. She remembered hearing some loud yelling, like people arguing inside the house, and then everything suddenly went silent. Shortly thereafter, P.S. opened the front door from inside the home and yelled for Rowe to grab whatever she can. Rowe recalled that her response to P.S. at this time was, "all right, dude, okay, whatever." (Tr. Trans. p. 208). Rowe stated that when she entered the Rios' house, P.S. told her to "Go that way," pointing to the Rios' bedroom. (Tr. Trans. p. 272). Rowe admitted to going into the bedroom and stealing a jewelry box from the headboard of the bed. Rowe remembered seeing P.S. take a boot with something he shoved inside.

{¶36} Rowe was adamant that she did not see anyone in the house. She recalled that after hearing the argument inside, while she was on the front porch, she "found it weird that there was nobody in there when [she] went in the house." (Tr. Trans. p. 269). Det. Reinbolt and Rowe had the following dialogue about the path she took to get into the Rios bedroom from the front door.

> **Det. Reinbolt: Okay. I can tell you that it's impossible for you to go from that kitchen to where Mr. Rios was laying, to go from that kitchen to—in that bedroom without falling over him. That—that is a fact.**

**Rowe:  I dragged my feet, too.**

**Det. Reinbolt:  That's even—**

**Rowe:  I do drag my feet.**

**Det. Reinbolt:—more on my side of saying that it's impossible that you did not stumble—**

**Rowe:  Maybe I kicked him.  I don't know.  I might've stumbled on him.  I don't know.  I might've.  I know that I stepped on some wet shit and I almost busted my ass, I know that.**

(Tr. Trans. p. 209).

{¶37} Rowe stated that in the car as they were leaving the Rios residence, she asked P.S. where the pills were and he explained that he could not find them. Rowe recalled that when she returned to her apartment, she immediately went into the bathroom and vomited several times.  Rowe maintained that she did not know the Rioses were injured until she read it in the paper a few days later.

{¶38} Det. Reinbolt asked Rowe if she thought that in all the commotion the Rioses had just disappeared from the house.  Rowe simply responded, "I don't know.  I didn't ask questions.  That's the way it works.  You don't ask no questions."  (Tr. Trans. at 200).

{¶39} Bette Rios took the stand.  She testified that she could not make out any identifying attributes of the intruder.  She recalled that she was "too busy screaming" with her eyes closed to be able to get a closer look of her assailant.

(Tr. Trans. p. 86).   She remembered seeing her husband being struck with a weapon a few times by the intruder before he went still.   Bette recalled being beaten several times with the weapon, which she was able to identify as a wooden baseball bat.   When it was apparent that the intruder was no longer in the house, Bette testified that she slid from underneath the bed, pulled a sheet over her husband, who was breathing very heavily, and called 9-1-1.

{¶40} Pictures from the crime scene were admitted at trial.   These pictures depict the phone that Bette used to call 9-1-1 was covered in blood from when she picked up the receiver to make the call.   The pictures also show that the doorframe area between the kitchen and bedroom, where Frank Rios' battered body laid was covered with large pools of blood.   Notably, this area is the only way to access the bedroom, which Rowe admitted to entering when she stole Bette's jewelry box. Blood splatters from the forceful blows to Frank's head were visible on the walls, the bedroom door and some of the kitchen appliances.   The coroner, who performed the autopsy of Frank Rios, confirmed that he died from blunt force trauma to the head and that his injuries were consistent with being stuck by a baseball bat.

{¶41} Pictures of Bette's injuries were also admitted at trial.   Bette's head, arms and hands were bruised and swollen.   Bette received several stitches to close the wound on the left temple of her head.   One of the crime scene photos depicts

the blood-drenched carpet, where Bette was attempting to hide under the bed. Another photo depicts the ceiling above where Bette was laying. The ceiling had a deeply indented groove demonstrating the amount of force used by Bette's assailant as the bat was swung down on her body.

{¶42} Bette was able to assess that her purse, Frank's wallet and her jewelry boxes were missing from the home after the attack. Det. Reinbolt testified that Rowe was later found to be in possession of Bette's jewelry box and several pieces of her jewelry, which were deemed missing after the home invasion. Det. Reinbolt asked Rowe why she was in possession of the jewelry. Rowe answered that it was supposed to be pawned to get money for rent. Rowe also admitted to using one of Bette's rings to buy drugs the same day the home invasion occurred.

{¶43} Det. Reinbolt testified that he believed that Rowe was not completely truthful in her statements to him. He explained that in the course of its investigation, law enforcement found no evidence of drug trafficking in the Rios' home.

{¶44} Wesley Johnson, a friend of Rowe's and the person she left her son with on the night in question, testified that Rowe accompanied him to the Rios' house, in the summer of 2007, approximately a year-and-a-half before Frank Rios was killed. Johnson admitted that Frank Rios was an acquaintance of his father's and he went there to borrow some money to "go out and drink." (Tr. Trans. p.

103). At that time, Frank lent Johnson $250.00 to $300.00. Johnson explained that he parked his van in the Rios' driveway near the barn. Rowe remained in the van while Johnson talked to Frank Rios. Johnson explained that he paid Frank Rios back a week or two later by giving his father the money to give to Frank. Johnson admitted that after this instance, Rowe had asked him to borrow money from Frank Rios and other people, but he refused because it was too hard to pay the money back.

{¶45} Rowe's mother, Theresa Buckingham, testified that she received a phone call from Rowe later in the morning on the day of the home invasion occurred. Buckingham recalled that Rowe informed her that something bad had happened and that she would call her later. Buckingham recalled that a few days later, Rowe told her that someone was hit with a baseball bat and died as a result. Rowe told Buckingham that it "wasn't supposed to go down like that." (Tr. Trans. p. 121). Buckingham testified that Rowe admitted to being outside when Frank Rios was killed.

{¶46} Lindsay Hicks, an inmate at the Seneca County Jail, who shared a cell with Rowe as she awaited trial, testified to certain statements Rowe made to her during their incarceration together. Hicks testified that Rowe admitted to hearing Bette Rios scream and that when she entered the bedroom to steal the jewelry box, she stepped over Frank Rios, who grabbed her leg. Hicks also

testified that Rowe admitted to putting fingernail polish on her fingers tips that night to avoid detection by leaving fingerprints.

{¶47} The record supports the trial court's conviction of Rowe on each of the four complicity counts. The evidence demonstrates Rowe's complicity in her support, assistance and cooperation with P.S. in the commission of the aggravated robbery and aggravated burglary. The evidence demonstrates that both P.S. and Rowe gained access to the Rios' home in the early hours of November 2, 2008, with the purpose to commit a criminal offense—i.e. stealing items from the Rios' house. In the course of the committing the theft offense, serious physical harm was inflicted on both Frank and Bette Rios, which resulted in the commission of felonious assault. The death of Frank Rios was also caused during P.S.'s commission of aggravated burglary and aggravated robbery, both of which are offenses of violence, as required by R.C. 2903.02(B). See 2901.01(A)(9)(a).

{¶48} Moreover, in this instance, Rowe's participation in the criminal intent of the underlying offenses may be inferred from her presence, companionship, and conduct before and after the offenses were committed. The evidence demonstrates that Rowe was a willing participant in the plan to go to the Rios' residence, whether it was to obtain drugs or money for drugs. Despite Rowe's contentions that she was unaware of the magnitude of the crimes committed that night, the evidence demonstrates that Rowe had knowledge of the

events that transpired at the Rios' home early that Sunday morning. Moreover, there is ample evidence for the trier of fact to infer that Rowe played an active role in aiding and abetting P.S. in the commission of each of these offenses.

{¶49} Based on the evidence adduced at trial, we conclude that, after viewing the evidence in a light most favorable to the prosecution, a rational trier of fact could have found the essential elements of the crimes committed in this case were proven beyond a reasonable doubt. Moreover, in reviewing the weight of the evidence, we determine that the greater amount of credible evidence supports the verdict and, therefore, we cannot say that the factfinder clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. Accordingly, Rowe's third assignment of error is overruled.

*Second Assignment of Error*

{¶50} In her second assignment of error, Rowe argues that the trial court erred when it ordered her to serve consecutive sentences for her convictions for complicity to aggravated robbery and complicity to aggravated burglary. Specifically, Rowe argues that these crimes are allied offenses of similar import and should have merged for sentencing purposes.

{¶51} Recently, the Ohio Supreme Court, in *State v. Johnson*, 128 Ohio St.3d 153, 2010–Ohio–6314, 942 N.E.2d 1061, modified the test for determining

whether offenses are allied offenses of similar import. In *Johnson*, the Ohio Supreme Court emphasized the General Assembly's intent in directing courts to apply R.C. 2941.25, "which expressly instructs courts to consider the offenses at issue in light of the defendant's conduct."[3] *Id*. at 162, 2010–Ohio–6314, ¶ 46. The Court outlined the following test to be used in evaluating whether two or more offenses are allied offenses of similar import and subject to merger.

> **In determining whether offenses are allied offenses of similar import under R.C. 2941.25(A), the question is whether it is possible to commit one offense and commit the other with the same conduct, not whether it is possible to commit one without committing the other. * * * If the offenses correspond to such a degree that *the conduct of the defendant constituting commission of one offense constitutes commission of the other*, then the offenses are of similar import.**
>
> **If the multiple offenses *can* be committed by the same conduct, then the court must determine whether the offenses were committed by the same conduct, i.e., "a single act, committed with a single state of mind."**
>
> **If the answer to both questions is yes, then the offenses are allied offenses of similar import and will be merged.**
>
> **Conversely, if the court determines that the commission of one offense will *never* result in the commission of the other, *or if the***

---

[3] Section 2941.25 of the Revised Code states:

(A) Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one.

(B) Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them.

*offenses are committed separately, or if the defendant has separate animus for each offense*, **then, according to R.C. 2941.25(B), the offenses will not merge.**

*Johnson*, 128 Ohio St.3d at 163, 2010–Ohio–6314, ¶¶ 48-51. (Emphasis added).

**{¶52}** The Ohio Supreme Court has "consistently held that '[a]ggravated burglary and aggravated robbery are separate offenses and constitute separate aggravating circumstances because they do not arise from the same act.' " *State v. Ketterer*, 111 Ohio St.3d 70, 2006-Ohio-5283, ¶¶ 119-20; 855 N.E.2d 48 quoting *State v. Williams* (1996), 74 Ohio St.3d 569, 580, 660 N.E.2d 724. See, also, *State v. Fears* (1999), 86 Ohio St.3d 329, 344, 715 N.E.2d 136; *State v. Reynolds* (1998), 80 Ohio St.3d 670, 681, 687 N.E.2d 1358; *State v. Murphy* (1992), 65 Ohio St.3d 554, 577-578, 605 N.E.2d 884; *State v. Barnes* (1986), 25 Ohio St.3d 203, 207, 495 N.E.2d 922; *State v. Frazier* (1979), 58 Ohio St.2d 253, 256, 389 N.E.2d 1118.

**{¶53}** Nevertheless, the facts in this case demonstrate that each offense was committed by separate conduct. For instance, Rowe's role in aiding and abetting P.S. in the aggravated burglary was complete as soon as P.S. broke into the Rios' home while carrying a weapon and with the intent to commit a theft, the commission of which resulted in the murder of Frank Rios and felonious assault of Bette Rios. In a separate act, Rowe committed complicity to aggravated robbery when she assisted P.S. in robbing the Rioses by entering their home, at his

direction, and stealing items from them.  The fact that the Rioses were severely beaten by P.S. during the commission of the robbery elevated the offense to include aggravating circumstances.  Because these offenses were committed separately, we conclude that the trial court did not err in sentencing Rowe to serve consecutive prison terms for her complicity to aggravated robbery and complicity to aggravated burglary convictions.  Rowe's second assignment of error is overruled.

{¶54} For all these reasons the judgment of the Seneca County Court of Common Pleas is affirmed.

*Judgment Affirmed*

**PRESTON and WILLAMOWSKI, J.J., concur.**

**/jlr**