[Cite as *State v. Wright*, 2016-Ohio-5465.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## HARDIN COUNTY

STATE OF OHIO,

      PLAINTIFF-APPELLEE,                CASE NO. 6-15-14

      v.

DANIEL RAY WRIGHT, AKA
DANNY RAY WISECUP,                O P I N I O N

      DEFENDANT-APPELLANT.


Appeal from Hardin County Common Pleas Court
Trial Court No. CRI20152082

Judgment Affirmed

Date of Decision: August 22, 2016


APPEARANCES:

    *Todd A. Workman* for Appellant

    *Jason M. Miller* for Appellee

**PRESTON, J.**

{¶1} Defendant-appellant, Daniel Ray Wright, aka Danny Ray Wisecup ("Wright"), appeals the October 19, 2015 judgment entry of sentence of the Hardin County Court of Common Pleas. He argues that his convictions for complicity to burglary and complicity to theft are based on insufficient evidence and against the manifest weight of the evidence. For the reasons that follow, we affirm.

{¶2} On June 23, 2015, the Hardin County Grand Jury indicted Wright on Count One of burglary in violation of R.C. 2911.12(A)(2), a second-degree felony, Count Two of theft in violation of R.C. 2913.02(A)(1), (B)(2), a fifth-degree felony, and Count Three of receiving stolen property in violation of R.C. 2913.51(A), a fifth-degree felony. (Doc. No. 1). The indictment stemmed from the theft and resale of personal property from a residence, in which Wright was alleged to have participated or assisted with his codefendants, Amy Wells ("Wells") and Vickie Collins ("Collins"). (*See* Doc. No. 25).

{¶3} The case proceeded to a jury trial on October 14, 2015. (Oct. 14, 2015 Tr. at 2). At trial, Counts One and Two were amended to complicity to burglary and complicity to theft, respectively. (*See* Doc. No. 42); (Oct. 14, 2015 Tr. at 2). The jury found Wright guilty of Counts One, Two, and Three. (Oct. 14, 2015 Tr. at 250-252); (Doc. Nos. 37, 38, 39). At Wright's sentencing hearing on October 15, 2015, the trial court concluded that Counts One and Two are allied offenses, and the

Case No. 6-15-14

State elected to proceed for sentencing purposes as to Count One. (Oct. 15, 2015 Tr. at 34); (Doc. No. 45). The trial court sentenced Wright as to Counts One and Three and filed its judgment entry of sentence on October 19, 2015. (Oct. 15, 2015 Tr. at 33-36); (Doc. No. 45).

{¶4} On November 19, 2015, Wright filed a notice of appeal.[1] (Doc. No. 54). He raises two assignments of error for our review, which we address together, as Wright does in his brief.

**Assignment of Error No. I**

**The trial court/jury erred to the prejudice of the defendant/appellant in entering a guilty verdict to the offenses of Burglary and Theft as the evidence was insufficient to support the convictions.**

**Assignment of Error No. II**

**The trial court/jury erred to the prejudice of the defendant/appellant in entering a guilty verdict to the offenses of Burglary and Theft as the verdicts are not supported by the manifest weight of the evidence.**

{¶5} In his first and second assignments of error,[2] Wright argues that his convictions for complicity to burglary and complicity to theft are against the

---

[1] This court granted Wright's motion for leave to file a delayed appeal.

[2] The assignments of error stated here are taken from the statement of the assignments of error presented for review in Wright's brief. They differ from the assignments of error as stated in the argument section of Wright's brief. There, Wright states in his first assignment of error that he is challenging his burglary and receiving-stolen-property convictions, and he states in his second assignment of error that he is challenging only his burglary conviction. However, a reading of his argument suggests that he is challenging his complicity-to-burglary and complicity-to-theft convictions, as suggested in his statement of the assignments of error presented for review.

manifest weight of the evidence. Wright argues, "[T]here is absolutely no evidence that Appellant knowingly obtained or exerted control over the property of another. Thus, without this critical mental element, a theft never occurred. Without this theft, a burglary could not have occurred." (Appellant's Brief at 11). In other words, Wright argues that he did not know that a theft offense was committed by his codefendants, Wells and Collins; therefore, Wright argues, he cannot be guilty of complicity to burglary or complicity to theft.

{¶6} "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259 (1981), paragraph two of the syllabus, *superseded by state constitutional amendment on other grounds*, *State v. Smith*, 80 Ohio St.3d 89 (1997), fn.4. Accordingly, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *Id.* "In deciding if the evidence was sufficient, we neither resolve evidentiary conflicts nor assess the credibility of witnesses, as both are functions reserved for the trier of fact." *State v. Jones*, 1st Dist. Hamilton Nos. C-120570 and C-120571, 2013-Ohio-4775, ¶ 33, citing *State v. Williams*, 197 Ohio App.3d 505, 2011-Ohio-6267, ¶ 25 (1st Dist.).

*See also State v. Berry*, 3d Dist. Defiance No. 4-12-03, 2013-Ohio-2380, ¶ 19 ("Sufficiency of the evidence is a test of adequacy rather than credibility or weight of the evidence."), citing *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997).

{¶7} On the other hand, in determining whether a conviction is against the manifest weight of the evidence, a reviewing court must examine the entire record, "'weigh[ ] the evidence and all reasonable inferences, consider[ ] the credibility of witnesses and determine[ ] whether in resolving conflicts in the evidence, the [trier of fact] clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983). A reviewing court must, however, allow the trier of fact appropriate discretion on matters relating to the weight of the evidence and the credibility of the witnesses. *State v. DeHass*, 10 Ohio St.2d 230 (1967), paragraph one of the syllabus. When applying the manifest-weight standard, "[o]nly in exceptional cases, where the evidence 'weighs heavily against the conviction,' should an appellate court overturn the trial court's judgment." *State v. Haller*, 3d Dist. Allen No. 1-11-34, 2012-Ohio-5233, ¶ 9, quoting *State v. Hunter*, 131 Ohio St.3d 67, 2011-Ohio-6524, ¶ 119.

{¶8} Wright was convicted of complicity to burglary, complicity to theft, and receiving stolen property. In this appeal, Wright challenges only his complicity-to-

burglary and complicity-to-theft convictions. R.C. 2911.12, Ohio's burglary statute, provides, in relevant part:

(A) No person, by force, stealth, or deception, shall do any of the following:

* * *

(2) Trespass in an occupied structure or in a separately secured or separately occupied portion of an occupied structure that is a permanent or temporary habitation of any person when any person other than an accomplice of the offender is present or likely to be present, with purpose to commit in the habitation any criminal offense * * *.

R.C. 2911.12(A)(2). R.C. 2913.02, Ohio's theft statute, provides, in relevant part: "No person, with purpose to deprive the owner of property or services, shall knowingly obtain or exert control over either the property or services in any of the following ways: (1) Without the consent of the owner or person authorized to give consent * * *." R.C. 2913.02(A)(1). "A person acts knowingly, regardless of purpose, when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when the person is aware that such circumstances probably exist." R.C. 2901.22(B).

**{¶9}** R.C. 2923.03, Ohio's complicity statute, provides, in relevant part: "No person, acting with the kind of culpability required for the commission of an offense, shall do any of the following: * * * Aid or abet another in committing the offense * * *." R.C. 2923.03(A)(2). The Supreme Court of Ohio in *State v. Johnson* defined how a defendant may be convicted of complicity by aiding and abetting:

> To support a conviction for complicity by aiding and abetting pursuant to R.C. 2923.03(A)(2), the evidence must show that the defendant supported, assisted, encouraged, cooperated with, advised, or incited the principal in the commission of the crime, and that the defendant shared the criminal intent of the principal. Such intent may be inferred from the circumstances surrounding the crime.

93 Ohio St.3d 240 (2001), syllabus. *See also State v. Schaeffer*, 3d Dist. Seneca No. 13-14-34, 2015-Ohio-3531, ¶ 18, quoting *Johnson* at syllabus. "'Evidence of aiding and abetting may be shown by either direct or circumstantial evidence, and participation in criminal intent may be inferred from presence, companionship, and conduct before and after the offense is committed.'" *State v. Rowe*, 3d Dist. Seneca No. 13-10-14, 2011-Ohio-5739, ¶ 32, quoting *State v. Gragg*, 173 Ohio App.3d 270, 2007-Ohio-4731, ¶ 21 (12th Dist.).

**{¶10}** In challenging his complicity-to-burglary and complicity-to-theft convictions on appeal, Wright addresses only the "knowingly obtain or exert control

over * * * the property" element of theft.  Theft served as the underlying offense for the complicity-to-burglary offense.  Therefore, in light of the amended indictment charging Wright with complicity to burglary and complicity to theft, the questions presented in this appeal are whether there is sufficient evidence that Wright knowingly aided or abetted another in obtaining or exerting control over the property and whether the manifest weight of the evidence weighs against the presence of that element.  *See State v. Howland*, 12th Dist. Fayette No. 2006-08-035, 2008-Ohio-521, ¶ 48.

{¶11} The State called Wells as a witness.  (Oct. 14, 2015 Tr. at 66).  Wells is currently incarcerated at Dayton Correctional Institution for violating post-release control in another case and for the burglary for which she and Wright are codefendants.  (*Id.* at 67-69).  Wells pled guilty to the burglary offense.  (*Id.* at 69).  According to Wells, on "a couple different occasions," she, Wright, and Collins discussed a plan to take items from the home of Joshua Tudor ("Tudor") and his fiancée, Ashley Roberts ("Roberts"), in Forest, Ohio.  (*Id.* at 70-71, 74-75, 77, 92).  Roberts was a friend of Wells.  (*Id.* at 72).  Wells elaborated, "I mean we all three talked about what we were gonna do.  [Wright] was gonna drop us off, me and [Collins] were gonna go in, get stuff, come back out, and [Wright] would pick us up."  (*Id.* at 77).  Wells testified that they "were just waiting to get some gas money

to go over there and get it, to do it." (*Id.* at 75). According to Wells, the plan to go to Tudor and Roberts's house was Wells's idea. (*Id.* at 74).

{¶12} Wells testified that on February 16, 2015, Wright and Collins picked her up from her boyfriend's house, and the three of them went to Tudor and Roberts's house. (*Id.* at 70-73). They went in Wright's green Thunderbird, and Wright was driving. (*Id.* at 71). Wells testified that they had "just enough gas," and "everybody was getting pissed" because Wells could not remember where Tudor and Roberts's house was. (*Id.* at 75-76). According to Wells, they eventually found the house around lunch time, when they knew Roberts would not be home, and Wright dropped off Wells and Collins. (*Id.* at 76-77). Wells testified that she broke the window next to the back door to gain entry to the house, then she and Collins gathered up items in the house and carried them out of the house. (*Id.* at 78-82). According to Wells, Wright was waiting in his vehicle, and Wells and Collins put the items in the trunk of Wright's vehicle. (*Id.* at 82). Wells testified that they then went "[e]verywhere" to see if anyone wanted to buy the items and ultimately sold several of the items. (*Id.* at 83-86). According to Wells, Wright, Wells, and Collins all had input concerning the asking prices of the items. (*Id.* at 88).

{¶13} Wells testified that when Hardin County Sheriff's Office Detective Matt Douglas ("Douglas") first interviewed her about two months after they broke into Tudor and Roberts's house, she told Douglas that Roberts "let [them] break in

her house." (*Id.* at 91). According to Wells, she told Douglas that because she had "already been to prison for burglary before" and "didn't want to catch another burglary." (*Id.*). Wells added that, at her sentencing hearing for the burglary, she said the story she initially told Douglas about having permission was not true. (*Id.* at 92, 94). Wells testified that neither Tudor nor Roberts gave her permission to go into their house that day. (*Id.* at 92). According to Wells, she never told Collins that she had permission to enter the house.[3] (*Id.* at 92-93). Wells described what transpired when Collins learned that Wells told Douglas that Roberts gave them permission to break in:

> We were in the county jail and she's like I'm gonna take it to trial, and she had heard my statement, what my statement was, 'cause she got her discovery pack back, and she was like oh good, that's what we can say, we can say [Roberts] said we could go in there. So I was like alright. Well then I thought they're not gonna go with that. I mean because [Wright] didn't know that story that we were saying, so [Wright] couldn't go with the story too. You know what I mean? [Wright] didn't know that I had said that. I don't know if he got his

---

[3] The prosecuting attorney also asked Wells if she ever told Wright that she had permission to enter the house. (Oct. 14, 2015 Tr. at 92). The record reflects that Wells gave a nonverbal response, "Hmmph." (*Id.*). We are unable to discern whether this was a positive or a negative response.

discovery pack back or not, but then when it came down to it I'm not going to take it to trial and get hurt for lying.

(*Id.* at 93). Wells added that, when she, Collins, Wright, and others were being transported in a van from the jail to a court hearing, she made the suggestion that they say Roberts allowed them to break into the house: "I made the suggestion, I, in the van, made the suggestion that we say [Roberts] let us break in her house. That was my suggestion, my idea." (*Id.* at 94-95). According to Wells, Wright "was like I'm taking it to trial." (*Id.* at 95). Wells testified that, once they sold all of the stolen items, she, Wright, and Collins split the money three ways. (*Id.* at 96).

{¶14} On cross-examination, Wells testified that when Douglas interviewed her, the first thing she told him was that it was not a burglary. (*Id.* at 100-101). She testified that she and Roberts were "pretty close friends" who spoke multiple times a day. (*Id.* at 107-108). Wells acknowledged that she told Douglas that Roberts was addicted to "Perc thirties" and that she and Roberts scammed and connived to get money for their habits. (*Id.* at 101-104). This included Roberts taking Tudor's iPod, "her kid's iPods," and Tudor's "Anarchy DVD set" and selling them; however, Wells was not with Roberts when she took things from Tudor's house. (*Id.* at 104, 107). Wells admitted that she told Douglas that Roberts had "some major debts." (*Id.* at 104-105). Wells acknowledged that she told Douglas that Roberts was going to leave the house unlocked and put items in a clothes basket

near the couch for Wells to take. (*Id.* at 105-106, 108-109). Wells admitted that she told Douglas that when she and Collins entered the house, Collins "started looking around at other stuff," and Wells redirected Collins to get only what they were there to get. (*Id.* at 106). Wells told Douglas that, while the three-way split was supposed to be one-third for Wells, one-third for Wright and Collins together, and one-third for Roberts, they did not give Roberts her money. (*Id.* at 106, 109). Wells admitted that she has "been in prison quite a bit," including for kidnapping her son and for burglary. (*Id.* at 110). Wells acknowledged that she received a prison term of four years and ten months for the burglary of Tudor and Roberts's house. (*Id.*). Wells insisted, however, "It's not a deal. It wasn't for testifying against anybody. * * * At the end he said * * * if you take this sentence, you have to testify truthfully against your co-defendants, which I would've did [sic] anyway." (*Id.* at 117).

{¶15} Douglas also testified for the State. (*Id.* at 141). Douglas investigated the burglary of Tudor and Roberts's house. (*Id.* at 144). Douglas testified that Wright was a subject of interest to him after Douglas learned from local pawn shops that Wright and Collins attempted to sell items there. (*Id.* at 154-155). Douglas first interviewed Wright on February 19, 2015, when he was stopped by police and transported to the sheriff's office. (*Id.* at 154). According to Douglas, Wright denied any involvement with the theft and explained that, on February 16, 2015, he,

Collins, and Wells "went to Scioto Village [apartments] for a big electronics score" where Wright "was going to go buy some stuff." (*Id.* at 159-160). This was contrary to text messages on Wells's phone, which indicated that "they were going to sell items." (*Id.* at 160-161). According to Douglas, when he asked Wright at which apartment he attempted to buy items, Wright "drew a blank" and "didn't want to cooperate." (*Id.* at 161). In Douglas's investigation, he concluded that Wright, at one point, was in possession of the reported stolen items and sold or attempted to sell them. (*Id.* at 167-170).

{¶16} On cross-examination, Douglas testified that, within two days of the burglary, Roberts was "pointing the finger" at Wells. (*Id.* at 171-172). According to Douglas, when he first interviewed Wells, the first words out of her mouth were that this was not a burglary but a "set up deal." (*Id.* at 173). When asked if Wells's story seemed credible, Douglas responded, "Yes, I mean I take everybody – everybody's got a story." (*Id.* at 174).

{¶17} Wright called one witness: Collins. (*Id.* at 181). Collins testified that she is serving time at a community-based correctional facility resulting from a plea she made as to the burglary of Tudor and Roberts's house. (*Id.* at 181-182). When asked why she went to Tudor and Roberts's house, Collins testified that Wells told her that Roberts was "real bad on pills" and wanted them to "take some stuff out of the house and take it and sell it, and she would give [them] half the money for it."

(*Id.* at 183). When asked by Wright's counsel if it was "an inside job," Collins responded, "Yes." (*Id.*). According to Collins, when she and Wells entered the house, "there was a white little basket with some stuff in it, but [Collins] and Amy Wells went in separate rooms" and "just grabb[ed] like games," such as "Xboxes" and "a Wii." (*Id.* at 184). When asked by Wright's counsel why they took those items as opposed to anything else, Collins testified, "Because that was, that was the deal." (*Id.*). According to Collins, they were supposed to sell the items they took from the house and "split it three ways" between Collins, Wells, and Roberts. (*Id.* at 185). Collins testified that Wright was not to receive a cut, and "[h]e didn't have no part of it." (*Id.* at 186). Collins testified that Wright did not know about the deal and that "[b]asically, [Collins] asked him to give [them] a ride." (*Id.* at 185). Collins clarified that Wright did not know about the deal at the time she and Wells went into the house; however, when they came out of the house, "he was asking questions about stuff" and knew about the deal afterwards. (*Id.* at 185-186). According to Collins, Wells kept Roberts's share. (*Id.* at 186).

{¶18} On cross-examination, Collins admitted that she and Wright have been in a romantic relationship for "[a]bout three – three, four years," including on February 16, 2015—the day Wells and Collins burglarized Tudor and Roberts's house. (*Id.* at 186-187). When asked if their romantic relationship existed on the day Collins testified at trial, Collins responded, "Kinda, yeah." (*Id.* at 187). Collins

admitted that she did not want to see Wright convicted. (*Id.*). Collins elaborated on what she told Wright before they went to Tudor and Roberts's house:

> He actually – I did discuss, tell him like me – asked him to give us a ride, because he had a license and it's his car. So I asked him, you know, 'cause we was hooked on heroin, and I asked him if he would give me and Amy Wells a ride to go get some dope. That's where he thought he was taking us.

(*Id.* at 188). Collins added that she initially told Wright "just never mind" when she and Wells came out of the house with the electronic devices and Wright asked about the items, and Wright "got mad about it." (*Id.*). According to Collins, "as [they] started going to Kenton, then [she] started to tell him [Collins] and [Wells] did something bad" and confessed to Wright. (*Id.*). When asked why she told Wright that they did something bad if she thought they had permission to enter the house, Collins testified that it did not dawn on her until she saw Wells's actions at the house that they were breaking in. (*Id.* at 189-190). When asked why she did not tell Wright beforehand if she believed they had permission to enter the house, Collins testified, "He'd be like no" and would not have agreed to it. (*Id.* at 190-191). Collins admitted that, throughout her contact with law enforcement during this case, she did not mention having permission from anyone to go into Tudor and Roberts's house and that the day of her trial testimony was the first day she mentioned it. (*Id.*

at 191). According to Collins, she lied to Douglas "like the day after [they] did it" and told him she "didn't know nothin' about it" because, by then, she "already knew [she] was in the wrong." (*Id.* at 191).

{¶19} We first review whether the State presented sufficient evidence that Wright knowingly aided or abetted another in obtaining or exerting control over the property. *See State v. Velez*, 3d Dist. Putnam No. 12-13-10, 2014-Ohio-1788, ¶ 68, citing *State v. Wimmer*, 3d Dist. Marion No. 9-98-46, 1999 WL 355190, *1 (Mar. 26, 1999). We conclude that it did. Wells testified that it was her idea to take items from Tudor and Roberts's house and that, on a couple of occasions, she discussed the plan with Wright and Collins. The plan was for Wright to drop off Wells and Collins, for Wells and Collins to take items from the house, and for Wright to pick up Wells and Collins when they came out with the items. Wells, Wright, and Collins executed the plan together, with Wright driving Wells and Collins to Tudor and Roberts's house, waiting on them while they were inside, and driving the getaway car when they came out with the items. The story about having permission from Roberts to take items from the house was hatched by Wells *after* they were caught.

{¶20} Wells's testimony alone constitutes sufficient evidence that Wright knowingly aided and abetted Wells and Collins in obtaining or exerting control over the property. Viewing the evidence in a light most favorable to the prosecution, a rational trier of fact could have found that the prosecution proved beyond a

reasonable doubt that, by driving Wells and Collins to and from Tudor and Roberts's house, knowing that Wells and Collins intended to take items from the house without permission, Wright aided and abetted them in obtaining or exerting control of Tudor and Roberts's property. *State v. Tate*, 11th Dist. Lake No. 2010-L-145, 2011-Ohio-6848, ¶ 68 (stating that "[a]n overt act of assistance, such as driving a getaway car, if proven, is enough to show a defendant aided and abetted in an underlying crime" and holding that the defendant's convictions were supported by sufficient evidence). *See also State v. Street*, 3d Dist. Hancock No. 5-98-15, 1998 WL 735870, *4 (Oct. 21, 1998) ("[D]riving a getaway car can be considered evidence of aiding and abetting."). Therefore, Wright's complicity-to-burglary and complicity-to-theft convictions are supported by sufficient evidence.

{¶21} We next address whether Wright's complicity-to-burglary and complicity-to-theft convictions are against the manifest weight of the evidence—specifically, whether the manifest weight of the evidence weighs against the presence of the "knowingly obtain or exert control over * * * the property" element. *See Velez* at ¶ 76. As we discussed above, Wells testified that Wright knew beforehand that the plan was for Wells and Collins to enter Tudor and Roberts's house to take property, with Wright dropping them off and picking them up. Indeed, Wells, Wright, and Collins executed the plan, and it was not until after they were caught that Wells fabricated the story that Roberts gave her permission. Weighing

against Wright's convictions, Wright's counsel called Wells's credibility into question because her story changed. She initially told Douglas that they received permission from Roberts to take the items from the house; however, she recanted that version of the events and entered into a plea agreement with the State, receiving a sentence of four years and ten months in prison for the burglary.

{¶22} Wright argues that Collins's testimony weighs against Wright's convictions and is consistent with the story Wells initially told Douglas; however, Collins's testimony does not weigh against Wright's convictions as heavily as Wright suggests. Collins testified that Wells told her that Roberts wanted them to take items from Tudor and Roberts's house and sell the items. That was "the deal," according to Collins. She also testified that Wright did not know about the deal at the time Wells and Collins went into the house; however, he knew about the deal after they came out of the house with the items. The State called Collins's story and credibility into question on cross-examination. Collins admitted that she knew, based on Wells's actions once they entered and were inside Tudor and Roberts's house, that they were breaking in without permission. She also testified that, after she and Wells got back into the car with the items from the house, Collins confessed to Wright that they had just broken in to the house without permission. Collins also admitted that she is in a romantic relationship with Wright and does not want to see him convicted. Finally, Collins admitted that it was not until the day of her

testimony at trial that she mentioned that she and Wells had permission to enter the house.

{¶23} There undeniably is a conflict between Wells's and Collins's versions of the events—specifically, as to whether and when Wright knew that Wells and Collins were breaking into Tudor and Roberts's house and taking items without permission. However, as we stated above, even under Collins's versions of the events, the jury could have inferred that Wright drove Wells, Collins, and the stolen items away from the house knowing that they were obtained without permission. Indeed, even after learning the items were taken without permission, he proceeded to sell or attempt to sell them. As we concluded above, driving the getaway car is an overt act of assistance amounting to aiding and abetting. *See Tate*, 2011-Ohio-6848, at ¶ 68; *Street*, 1998 WL 735870, at *4.

{¶24} Moreover, to the extent this case hinges on Wells's and Collins's credibility, "[i]t is axiomatic that the trier of fact is in the best position to take into account inconsistencies, along with the witnesses' manner and demeanor, and determine whether the witnesses' testimony is credible." *State v. Miller*, 3d Dist. Seneca No. 13-12-52, 2013-Ohio-3194, ¶ 48, citing *State v. Thompson*, 3d Dist. Crawford No. 3-10-23, 2011-Ohio-3631, ¶ 13, citing *Seasons Coal Co. v. Cleveland*, 10 Ohio St.3d 77, 80 (1984). Accordingly, because the jury was in the best position to resolve issues of credibility, and because evidence weighs in favor

of the convictions, we cannot conclude that the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the convictions must be reversed and a new trial ordered. Wright's convictions for complicity to burglary and complicity to theft are not against the manifest weight of the evidence.

{¶25} Wright's first and second assignments of error are overruled.

{¶26} Having found no error prejudicial to the appellant herein in the particulars assigned and argued, we affirm the judgment of the trial court.

*Judgment Affirmed*

**SHAW, P.J. and ROGERS, J., concur.**

**/jlr**