[Cite as *State v. Laws*, 2021-Ohio-166.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## ALLEN COUNTY

STATE OF OHIO,

      PLAINTIFF-APPELLEE,

      CASE NO. 1-20-10

      v.

KIARRIS M. LAWS,

      **O P I N I O N**

      DEFENDANT-APPELLANT.

---

Appeal from Allen County Common Pleas Court
Trial Court No. CR2018 0527

Judgment Affirmed

Date of Decision: January 25, 2021

---

APPEARANCES:

    *Thomas J. Lucente, Jr.* for Appellant

    *Jana E. Emerick* for Appellee

**PRESTON, J.**

{¶1} Defendant-appellant, Kiarris M. Laws ("Laws"), appeals the February 11, 2020 judgment of sentence of the Allen County Court of Common Pleas. For the reasons that follow, we affirm.

{¶2} At some time between 7:30 and 8:00 p.m. on December 2, 2018, Dequaisha Wilson ("Wilson") received a phone call from Alonzo Williams, Jr. ("Williams"). Williams called Wilson to tell her that he had clothes for A.W., their son. Williams told Wilson that he was at an apartment complex located on the south side of Lima, Ohio and that she could pick up the clothes there. After the phone call, Wilson drove with A.W. to the apartment complex to meet with Williams. Williams told Wilson that he would be waiting for her inside of a white truck.

{¶3} Once Wilson arrived at the apartment complex, she parked her vehicle next to the white truck and waited for Williams. However, Williams did not exit the truck, and after waiting for some time, Wilson got out of her vehicle and opened one of the truck's passenger-side doors. When she opened the door, she saw that Marquavius Shurelds ("Shurelds"), not Williams, was inside of the truck. According to Wilson, it appeared that Shurelds was searching for something inside of the truck. Wilson asked Shurelds about Williams's whereabouts, and Shurelds responded that Williams was inside one of the apartments. Although Shurelds suggested that Wilson follow him into the apartment, Wilson instead returned to her

vehicle and waited for Williams to emerge from the apartment. However, Williams again failed to appear.

{¶4} Eventually, Wilson got out of her vehicle for a second time, approached the white truck, and began transferring clothes from the truck to her vehicle. A.W. remained in his car seat in the back seat of Wilson's vehicle. As Wilson was transferring the clothes, Shurelds "grabbed [her] up from the back, covering [her] mouth[,]" and told her "to shut * * * up or he was going to kill [her]." (Dec. 10-11, 2019 Tr., Vol. I, at 140-141). Shurelds then forced Wilson into the apartment, where he proceeded to wrap a blanket around her head. With the blanket around her head, Wilson could not see anything that was happening inside of the apartment.

{¶5} Some time later, the blanket was taken off of Wilson's head. She noticed that Williams, who had been stabbed, was "bleeding out" on the floor and that Laws and another person, Lamont Jones ("Jones"), were inside of the apartment. (*Id.* at 144). A.W. was then carried into the apartment and returned to Wilson. As Wilson held A.W., Laws stood inside of the apartment and pointed a gun at them. While Laws held Wilson and A.W. at gunpoint, Shurelds paced the floor of the apartment and talked to Williams. Shurelds told Williams, "We need that." (*Id.* at 147). Williams responded that they "c[ould] have that" and that he "had the key in his pocket." (*Id.* at 148). After the key was retrieved from Williams's pocket, Jones left the apartment with the key.

{¶6} After Jones left, Laws demanded that Wilson and Williams give him their cell phones and passcodes so that he could "turn the locations off." (*Id.* at 148-149). Wilson and Williams both complied. Once he had turned off the location services features on Wilson's and Williams's cell phones, Laws kept the phones.

{¶7} After some time, Jones returned to the apartment with money. When Shurelds saw the money that Jones had returned with, Shurelds said that "they need[ed] more[.]" (Dec. 10-11, 2019 Tr., Vol. I, at 151). Shurelds then placed a call to Williams's sister, Betty, and put the phone next to Williams's ear. Williams told Betty that "he needed that." (*Id.* at 152-153). During this time, Laws was still holding Wilson and A.W. at gunpoint.

{¶8} After the phone call, Shurelds, Wilson, and A.W. got into a vehicle and drove over to Betty's house. Laws stayed behind at the apartment with Williams. According to Wilson, when they arrived at the house, "Betty's baby dad c[ame] outside with a box." (*Id.* at 153-154). Then, as the vehicle pulled away from Betty's house, Shurelds "thr[ew] out a phone." (*Id.* at 154). Wilson did not know whose phone Shurelds threw out.

{¶9} When Shurelds, Wilson, and A.W. returned to the apartment, Shurelds and Jones began cleaning up Williams's blood. As he was helping Shurelds clean, Jones said to Wilson that he was "going to get [Wilson and A.W.] out of [there]." (*Id.* at 155). Laws, Shurelds, and Jones then placed Williams in Wilson's vehicle.

Wilson was permitted to leave with Williams and A.W. She then drove to a hospital to seek treatment for Williams's injuries.

{¶10} On January 17, 2019, the Allen County Grand Jury indicted Laws on five counts: Count One of aggravated robbery in violation of R.C. 2911.01(A)(1), a first-degree felony; Counts Two through Four of kidnapping in violation of R.C. 2905.01(A)(2), first-degree felonies;[1] and Count Five of having weapons while under disability in violation of R.C. 2923.13(A)(2), a third-degree felony. (Doc. No. 4). Count One of the indictment contained two specifications: a three-year firearm specification under R.C. 2941.145(A) and a repeat violent offender specification under R.C. 2941.149(A). (Id.). Furthermore, Counts Two through Four each contained one three-year firearm specification under R.C. 2941.145(A) and one repeat violent offender specification under R.C. 2941.149(A). (Id.). On January 25, 2019, Laws appeared for arraignment with his court-appointed counsel and pleaded not guilty to the counts and specifications of the indictment. (Doc. Nos. 11, 12).

{¶11} Following arraignment, Laws retained counsel, and on March 14, 2019, Laws's retained counsel entered a notice of appearance. (Doc. No. 25). Laws's retained counsel filed various motions on behalf of Laws over the next

---

[1] Counts Two, Three, and Four charged Laws with the kidnappings of Wilson, A.W., and Williams, respectively.

several months. However, on September 20, 2019, Laws's retained counsel filed a motion to withdraw on grounds that Laws had "advised that he wish[ed] to be represented by a court appointed lawyer * * *." (Doc. No. 47). On October 11, 2019, the trial court granted Laws's retained counsel's motion to withdraw. (Doc. No. 51). In its judgment granting the motion to withdraw, the trial court noted that Laws "stated he did not need a court-appointed attorney." (*Id.*). Nevertheless, on October 31, 2019, Laws received a second court-appointed attorney—his third attorney overall. (Doc. No. 57).

{¶12} On November 20, 2019, Laws subpoenaed "all camera footage from 12-2-2018 from the hours of 6PM to 10PM that shows the exterior of either of the front entrances" to the Meijer grocery store located in Lima, Ohio. (Doc. No. 91). In a letter dated November 27, 2019, Meijer responded that "no responsive surveillance footage exists." (Doc. No. 117).

{¶13} On December 5, 2019, Laws filed a notice of alibi. (Doc. No. 109). On December 6, 2019, the State filed a response to Laws's notice of alibi. (Doc. No. 113). The State argued that Laws's notice failed to conform to the Rules of Criminal Procedure and that, as a result, "any evidence offered by [Laws] * * * for the purpose of presenting an alibi defense" should be excluded. (*Id.*).

{¶14} A jury trial was held on December 10-11, 2019. Before the presentation of evidence, the trial court ruled on whether Laws would be permitted

to present his alibi witnesses. Laws's third attorney noted that although the notice of alibi was not filed at least seven days before trial as required by Crim.R. 12.1, Laws did not inform him about his alibi until the evening of December 4, 2019. (Dec. 10-11, 2019 Tr., Vol. I, at 3). The trial court ruled that Laws would be permitted to present his alibi witnesses. (*Id.* at 11). In addition, after the trial court overruled the State's objections to Laws's notice of alibi, the trial court dismissed Count Four of the indictment pursuant to the State's motion. (*See* Dec. 10-11, 2019 Tr., Vol. I, at 13); (Doc. No. 129). Count Five of the indictment was subsequently renumbered as Count Four.

{¶15} After these initial housekeeping matters were addressed, the State proceeded to present its case. At the close of the State's case, Laws moved for a judgment of acquittal under Crim.R. 29. The trial court denied Laws's motion.

{¶16} On December 11, 2019, the jury found Laws guilty of the remaining counts of the indictment as well as the remaining firearm specifications. (Doc. Nos. 125, 126, 127, 128). The trial court filed its judgment entry of conviction on December 12, 2019. (Doc. No. 129).

{¶17} On January 13, 2020, Laws's third attorney filed a motion to withdraw from his representation of Laws on grounds that "[c]ommunication with [Laws] ha[d] broken down." (Doc. No. 133). On January 15, 2020, the trial court granted Laws's third attorney's motion. (Doc. No. 138). Although Laws indicated that he

was planning on retaining a new attorney, on January 24, 2020, Laws received a third court-appointed attorney—his fourth attorney overall. (Doc. No. 144).

{¶18} At the February 10, 2020 sentencing hearing, the trial court found that Laws is a repeat violent offender. (Feb. 10, 2020 Tr. at 10); (Doc. No. 157). The trial court then sentenced Laws to 11 years in prison on Count One, 11 years in prison on Count Two, 11 years in prison on Count Three, and 36 months in prison on renumbered Count Four. (Doc. No. 157). In addition, the trial court sentenced Laws to 3 years in prison with respect to each of the repeat violent offender specifications associated with Counts One through Three. (*Id.*). The trial court also sentenced Laws to a mandatory term of 3 years in prison with respect to each of the firearm specifications associated with Counts One through Three. (*Id.*). The trial court ordered that all of these prison terms be served consecutively for an aggregate term of 54 years in prison. (*Id.*). Finally, because Laws was on postrelease control ("PRC") at the time the instant offenses were committed, the trial court ordered that 1,327 days of PRC time be served consecutively to the aggregate 54-year prison term. (*Id.*). The trial court filed its judgment entry of sentence on February 11, 2020. (*Id.*).

{¶19} On February 27, 2020, Laws filed a notice of appeal. (Doc. No. 162). He raises three assignments of error for our review.

**Assignment of Error No. I**

**The trial court erred in denying appellant's motion for acquittal at the close of the State's case in chief, where there was legally insufficient evidence to establish each material element of the offenses beyond a reasonable doubt.**

{¶20} In his first assignment of error, Laws argues that the trial court erred by denying his Crim.R. 29 motion because the State presented insufficient evidence to support his aggravated-robbery and kidnapping convictions.

{¶21} Because the purpose of a Crim.R. 29 motion for acquittal "is to test the sufficiency of the evidence presented at trial," we "review[] a denial of a Crim.R. 29 motion for judgment of acquittal using the same standard that is used to review a sufficiency of the evidence claim." *State v. Willis*, 12th Dist. Butler No. CA2009-10-270, 2010-Ohio-4404, ¶ 9, citing *State v. Terry*, 12th Dist. Fayette No. CA2001-07-012, 2002-Ohio-4378, ¶ 9, citing *State v. Williams*, 74 Ohio St.3d 569, 576 (1996); *State v. Lightner*, 3d Dist. Hardin No. 6-08-11, 2009-Ohio-544, ¶ 11, citing *State v. Carter*, 72 Ohio St.3d 545, 553 (1995). "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus, *superseded by state constitutional amendment on other grounds*, *State v. Smith*, 80 Ohio St.3d 89 (1997). Consequently, "[t]he relevant inquiry is whether,

after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *Id.* "In deciding if the evidence was sufficient, we neither resolve evidentiary conflicts nor assess the credibility of witnesses, as both are functions reserved for the trier of fact." *State v. Jones*, 1st Dist. Hamilton Nos. C-120570 and C-120571, 2013-Ohio-4775, ¶ 33, citing *State v. Williams*, 197 Ohio App.3d 505, 2011-Ohio-6267, ¶ 25 (1st Dist.). *See also State v. Berry*, 3d Dist. Defiance No. 4-12-03, 2013-Ohio-2380, ¶ 19 ("Sufficiency of the evidence is a test of adequacy rather than credibility or weight of the evidence."), citing *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997).

{¶22} Laws was convicted of one count of aggravated robbery, two counts of kidnapping, and one count of having weapons while under disability. However, on appeal, Laws argues only that the trial court erred by denying his Crim.R. 29 motion with respect to his aggravated-robbery and kidnapping convictions. The offense of aggravated robbery is contained in R.C. 2911.01, which provides, in relevant part, that "[n]o person, in attempting or committing a theft offense, as defined in [R.C. 2913.01], or in fleeing immediately after the attempt or offense, shall * * * [h]ave a deadly weapon on or about the offender's person or under the offender's control and either display the weapon, brandish it, indicate that the offender possesses it, or use it[.]" R.C. 2911.01(A)(1). The offense of kidnapping

is contained in R.C. 2905.01, which provides, in relevant part, that "[n]o person, by force, threat, or deception, * * * shall remove another from the place where the other person is found or restrain the liberty of the other person * * * [t]o facilitate the commission of any felony or flight thereafter[.]" R.C. 2905.01(A)(2). The aggravated robbery charged in Count One served as the predicate felony for the kidnapping charges. (*See* Dec. 10-11, 2019 Tr., Vol. II, at 351).

{¶23} At this point, we note that while Laws was indicted in terms of the principal offenses, the State theorized that Laws acted in complicity with Shurelds and Jones. (*See* Dec. 10-11, 2019 Tr., Vol. II, at 342-344). It was permissible for Laws to be charged in this way. R.C. 2923.03(F) ("A charge of complicity may be stated in terms of [R.C. 2923.03], or in terms of the principal offense."). R.C. 2923.03, Ohio's complicity statute, provides in relevant part that "[n]o person, acting with the kind of culpability required for the commission of an offense, shall * * * [a]id or abet another in committing the offense[.]" R.C. 2923.03(A)(2).

> To support a conviction for complicity by aiding and abetting pursuant to R.C. 2923.03(A)(2), the evidence must show that the defendant supported, assisted, encouraged, cooperated with, advised, or incited the principal in the commission of the crime, and that the defendant shared the criminal intent of the principal. Such intent may be inferred from the circumstances surrounding the crime.

-11-

*State v. Johnson*, 93 Ohio St.3d 240 (2001), syllabus. ""'Evidence of aiding and abetting may be shown by either direct or circumstantial evidence, and participation in criminal intent may be inferred from presence, companionship, and conduct before and after the offense is committed.'"" *State v. Wright*, 3d Dist. Hardin No. 6-15-14, 2016-Ohio-5465, ¶ 9, quoting *State v. Rowe*, 3d Dist. Seneca No. 13-10-14, 2011-Ohio-5739, ¶ 32, quoting *State v. Gragg*, 173 Ohio App.3d 270, 2007-Ohio-4731, ¶ 21 (12th Dist.). However, "'[t]he mere presence of an accused at the scene of the crime is not sufficient to prove, in and of itself, that the accused was an aider and abettor.'" *State v. Martinez*, 3d Dist. Union Nos. 14-19-28 and 14-19-29, 2020-Ohio-4883, ¶ 24, quoting *State v. Widner*, 69 Ohio St.2d 267, 269 (1982). A person who is found guilty of complicity "shall be prosecuted and punished as if he were a principal offender." R.C. 2923.03(F).

{¶24} Laws argues that his aggravated-robbery conviction is not supported by sufficient evidence because the State "failed to adequately demonstrate that a theft or attempted theft took place, which is an essential element of the aggravated robbery charge." (Appellant's Brief at 10). He maintains that "[t]he record does not indicate anywhere that [he] stole anything or that he was trying to steal anything." (*Id.*). Furthermore, concerning his kidnapping convictions, he argues that "[i]f there were no theft or attempted theft, then there was no aggravated robbery and if there were no aggravated robbery, there is no kidnapping under the

statute."[2] (*Id.*). Consequently, Laws's argument turns entirely on whether the State presented sufficient evidence that he or his accomplices committed or attempted to commit a "theft offense."

{¶25} "Theft offense" is defined in part as "[a] violation of * * * [R.C. 2913.02]." R.C. 2913.01(K)(1). R.C. 2913.02 provides that "[n]o person, with purpose to deprive the owner of property * * *, shall knowingly obtain or exert control over * * * the property * * * [w]ithout the consent of the owner or person authorized to give consent[.]" R.C. 2913.02(A)(1). "Deprive" means to "[w]ithhold property of another permanently, or for a period that appropriates a substantial portion of its value or use, or with purpose to restore it only upon payment of a reward or other consideration" or to "[d]ispose of property so as to make it unlikely that the owner will recover it." R.C. 2913.01(C)(1)-(2). "Owner" means "any person, other than the actor, who is the owner of, who has possession or control of,

---

[2] Laws errs in asserting that "if there were no aggravated robbery, there is no kidnapping." To sustain a conviction for kidnapping under R.C. 2905.01(A)(2), the State is not required to prove that the defendant actually committed the predicate felony. Instead, because R.C. 2905.01(A)(2) "punishes restraint or removal *with a certain purpose*," the State needs to prove only that the defendant removed the victim or restrained their liberty "with the *purpose* to facilitate the commission of a felony." (Emphasis sic.) *State v. Seitz*, 3d Dist. Shelby No. 17-12-11, 2014-Ohio-2463, ¶ 17-18, citing *State v. Matthieu*, 3d Dist. Mercer Nos. 10-02-04 and 10-02-05, 2003-Ohio-3430, ¶ 17. "'[T]he eventual success or failure of the goal is irrelevant.'" *Matthieu* at ¶ 17, quoting *State v. Moore*, 8th Dist. Cuyahoga No. 60334, 1992 WL 104220 (May 14, 1992). Therefore, even if the State failed to present evidence sufficient to prove all of the elements of aggravated robbery, including that Laws committed or attempted to commit a "theft offense," Laws could still be convicted of kidnapping under R.C. 2905.01(A)(2) if the State presented sufficient evidence that he removed the victims or restrained their liberty for the purpose of facilitating the (ultimately unproven) aggravated robbery. However, proof that the defendant actually committed the felony facilitated by the removal or restraint is, of course, also sufficient to sustain a conviction under R.C. 2905.01(A)(2), and in light of our conclusion below that the State presented sufficient evidence that Laws was complicit in the commission of a "theft offense," we need not uphold Laws's kidnapping convictions on the alternative basis that the State was not required to prove that Laws committed aggravated robbery.

or who has any license or interest in property * * *, even though the ownership, possession, control, license, or interest is unlawful." R.C. 2913.01(D). "Property" means "any property, real or personal, tangible or intangible, and any interest or license in that property." R.C. 2901.01(A)(10)(a).

{¶26} R.C. 2913.02(A) requires proof of two different culpable mental states: "purpose" and "knowingly." "A person acts purposely when it is the person's specific intention to cause a certain result, or, when the gist of the offense is a prohibition against conduct of a certain nature, regardless of what the offender intends to accomplish thereby, it is the offender's specific intention to engage in conduct of that nature." R.C. 2901.22(A). "A person acts knowingly, regardless of purpose, when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature." R.C. 2901.22(B).

{¶27} After reviewing the record, we conclude that, when viewing the evidence in a light most favorable to the State, any rational trier of fact could have found that, at the very least, Laws aided and abetted Shurelds and Jones in the commission of a theft offense. According to Wilson, while Laws held her and A.W. at gunpoint, Shurelds told Williams, who was injured and bleeding on the floor, that they "needed that." (Dec. 10-11, 2019 Tr., Vol. I, at 147). Wilson testified that Williams told Shurelds that Shurelds could have what he was looking for and that Williams told Shurelds that he had a key on his person that would allow Shurelds to

retrieve what he wanted. (*Id.* at 148). Jones, who also testified at Laws's trial, confirmed that he left the apartment "[t]o go get what [Williams] wanted [him] to get," and he clarified that he went to collect "[s]ome drugs and money." (*Id.* at 182). Jones stated that Williams wanted him to go get the drugs and money so that Williams, Wilson, and A.W. "c[ould] get out of there." (*Id.*). In addition, Wilson testified that Shurelds was apparently dissatisfied with the amount of money with which Jones returned and that he stated that "they need[ed] more[.]" (*Id.* at 151). Wilson stated that Shurelds made Williams "straighten up to call [Betty]," which meant that Shurelds wanted Williams "to talk correct, like as if nothing [was] going on," and that during the phone call with Betty, Williams told Betty that "he needed that." (*Id.* at 151-153). According to Wilson, Laws was still holding her and A.W. at gunpoint. (*Id.* at 151). Further, Wilson testified that after the phone call ended, she, A.W., and Shurelds went to Betty's house, where a box was brought outside to Shurelds. (*Id.* at 153-154). The record is unclear as to what the box contained.

{¶28} The foregoing testimony establishes that Shurelds and Jones committed at least one theft offense on December 2, 2018. Williams, who had been stabbed and whose child was being held at gunpoint, agreed to give Shurelds and Jones drugs and money so that he, Wilson, and A.W. could be permitted to leave the apartment. Although some of the property obtained by Shurelds and Jones was apparently contraband, it was property all the same, and it is clear that Williams

owned, possessed, or controlled the property. Furthermore, the manner in which the money and drugs were obtained establishes a lack of valid consent. *See State v. Evans*, 8th Dist. Cuyahoga No. 108648, 2020-Ohio-3968, ¶ 56 ("The subject property was obtained in a threatening manner, establishing the lack of consent * * *."). Moreover, from the facts established by Wilson's testimony and Jones's testimony, it can be readily inferred both that Shurelds and Jones knew that they were obtaining Williams's drugs and money without valid consent and that they intended to permanently withhold Williams's drugs and money from him.

{¶29} Finally, Wilson's testimony and Jones's testimony preclude the possibility that Laws was merely present when the theft offense occurred. At various points during the incident, Laws pointed his gun at Wilson and A.W. to keep them at bay. In addition, Laws personally disabled the location-tracking features on Wilson's and Williams's cell phones. Furthermore, according to Wilson, Laws directed menacing comments toward her, such as that he would kill her if she was not quiet and that he "might as well kill [her]" because she was "going to tell everything." (Dec. 10-11, 2019 Tr., Vol. I, at 143-144, 151). The totality of Laws's conduct on December 2, 2018 demonstrates that he shared in Shurelds and Jones's criminal purpose and that he supported and assisted Shurelds and Jones in the commission of the theft offense. Accordingly, because we conclude that the State presented evidence sufficient to show that Laws was at least complicit in the

commission of a theft offense, Laws's aggravated-robbery and kidnapping convictions are supported by sufficient evidence.

{¶30} Laws's first assignment of error is overruled.

### Assignment of Error No. II

**Appellant's conviction was against the manifest weight of the evidence and is contrary to law.**

{¶31} In his second assignment of error, Laws argues that his aggravated-robbery and kidnapping convictions are against the manifest weight of the evidence. Specifically, Laws argues that "[a]s noted above in [his first assignment of error], the State failed to prove * * * that there was a theft or attempted theft" and that "[w]ithout a theft or attempted theft, the State's entire case collapses as then there is no aggravated robbery and if there is no aggravated robbery, there is no kidnapping." (Appellant's Brief at 13). He concludes that "[b]ecause the State failed to prove there was a theft and the jury convicted him anyway, the trier of fact clearly lost its way and created * * * a manifest miscarriage of justice * * *." (*Id.*).

{¶32} While Laws frames his second assignment of error as a challenge to the weight of the evidence supporting his convictions and sets forth the standard of review for a manifest-weight challenge in his appellate brief, he fails to advance a proper manifest-weight argument. Laws does not attack the credibility of the State's witnesses. He does not maintain that the jury drew unreasonable inferences from the evidence presented or that the jury erred in resolving evidentiary conflicts. Nor

does Laws argue that the jury lost its way by discounting the testimony of his alibi witness. Instead, Laws rehashes the sufficiency-of-the-evidence arguments he made under his first assignment of error. However, "'sufficiency and manifest weight are two separate, legally distinct arguments.'" *State v. Secriskey*, 9th Dist. Summit Nos. 28093 and 28094, 2017-Ohio-4169, ¶ 26, quoting *State v. Vicente-Colon*, 9th Dist. Lorain No. 09CA009705, 2010-Ohio-6242, ¶ 20. This court will not develop a manifest-weight argument on Laws's behalf, and we therefore decline to consider Laws's second assignment of error any further. *See id.*, citing *State v. Sadeghi*, 9th Dist. Wayne No. 14AP0051, 2016-Ohio-744, ¶ 32; *State v. Shannon*, 9th Dist. Lorain No. 13CA010517, 2015-Ohio-438, ¶ 25, quoting *State v. Auerswald*, 9th Dist. Medina No. 11CA0053-M, 2013-Ohio-742, ¶ 50.

{¶33} Laws's second assignment of error is overruled.

### Assignment of Error No. III

**The cumulative effect of appellant's trial counsel's failures deprived appellant of his rights to a fair trial and the effective assistance of counsel as guaranteed by the Sixth Amendment to the United States Constitution.**

{¶34} In his third assignment of error, Laws argues that he received ineffective assistance of counsel.

{¶35} A defendant asserting a claim of ineffective assistance of counsel must establish: (1) the counsel's performance was deficient or unreasonable under the circumstances; and (2) the deficient performance prejudiced the defendant. *State v.*

*Kole*, 92 Ohio St.3d 303, 306 (2001), citing *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052 (1984). In order to show counsel's conduct was deficient or unreasonable, the defendant must overcome the presumption that counsel provided competent representation and must show that counsel's actions were not trial strategies prompted by reasonable professional judgment. *Strickland* at 689. Counsel is entitled to a strong presumption that all decisions fall within the wide range of reasonable professional assistance. *State v. Sallie*, 81 Ohio St.3d 673, 675 (1998). Tactical or strategic trial decisions, even if unsuccessful, do not generally constitute ineffective assistance. *State v. Frazier*, 61 Ohio St.3d 247, 255 (1991). Rather, the errors complained of must amount to a substantial violation of counsel's essential duties to his client. *See State v. Bradley*, 42 Ohio St.3d 136, 141-142 (1989), citing *State v. Lytle*, 48 Ohio St.2d 391, 396 (1976).

{¶36} Prejudice results when "'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Id.* at 142, quoting *Strickland* at 694. "'A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" *Id.*, quoting *Strickland* at 694.

{¶37} As noted in the opening pages of this opinion, Laws was represented by four different attorneys during the pendency of this case at the trial court level.

Laws takes issue with the performance of his first three attorneys.[3] Laws claims that his first three attorneys were ineffective in seven different respects. He also maintains that the cumulative effect of his attorneys' alleged errors rendered their representation ineffective.

{¶38} In his first claim of ineffective assistance of counsel, Laws argues that each of his first three attorneys performed deficiently with respect to the handling of his alibi defense. Laws contends that he has consistently maintained that he spent December 2, 2018 at his aunt's house, leaving only to go to the Meijer store in Lima. He notes that his first two attorneys did not attempt to obtain the surveillance video recordings from Meijer, and he asserts that by the time his third attorney requested the footage from the evening in question, "the footage was lost." (Appellant's Brief at 16-17). Laws thus argues that his first two attorneys were ineffective because they failed to act to obtain the surveillance video recordings—evidence that, according to Laws, would have corroborated his alibi and changed the outcome of his trial.

{¶39} However, under the facts of this case, we cannot determine whether Laws's first two attorneys performed deficiently by failing to request the surveillance video recordings or whether Laws was prejudiced by their inaction.

---

[3] Laws's fourth attorney, who was appointed to represent him after he had been found guilty but before sentencing, is counsel of record in this appeal.

Importantly, contrary to Laws's assertion, the record does not clearly indicate that the surveillance footage was "lost." Rather, in response to the subpoena, Meijer's representative said only that "after a review of applicable records, no responsive surveillance footage exists." (Doc. No. 117). From this statement, it is as possible that the footage was never archived as it is that it was archived but later deleted. Furthermore, even if the footage was saved but later deleted, there is nothing in Meijer's response letter or elsewhere in the record that speaks to Meijer's policy regarding the retention of video surveillance footage. Consequently, we cannot rule out the possibility that the footage was archived but that it was erased well before Laws's first two attorneys began representing him. In addition, the surveillance footage, if it ever existed, is not part of the record. We simply do not know whether there was in fact surveillance footage depicting Laws at Meijer on the evening of December 2, 2018, and we cannot "blindly accept" Laws's claim that the surveillance footage would have proven that he was there. *See State v. Moorer*, 10th Dist. Franklin No. 14AP-224, 2014-Ohio-4776, ¶ 29. Laws's argument relies entirely on speculation—speculation that his first two attorneys could have obtained the surveillance video footage and speculation about what the footage would have depicted. Ultimately, "[s]peculation is insufficient to establish ineffective assistance." *State v. Perez*, 124 Ohio St.3d 122, 2009-Ohio-6179, ¶ 217, citing *State*

*v. Were*, 118 Ohio St.3d 448, 2008-Ohio-2762, ¶ 219 and *State v. Elmore*, 111 Ohio St.3d 515, 2006-Ohio-6207, ¶ 121.

{¶40} Laws also objects to the way in which his third attorney handled his alibi defense. He claims that there were four people with him at his aunt's house on December 2, 2018, and he argues that his third attorney acted unreasonably by calling only one of them to testify because "[t]he calling of additional witness[es] would have bolstered the case and would have certainly given the jury reasonable doubt." (Appellant's Brief at 17). Laws further notes that one of the four potential alibi witnesses was not subpoenaed because there might have been a warrant for his arrest, and he maintains that the warrant should not have prevented his third attorney from attempting to call this person as a witness.

{¶41} This argument is also unavailing. As a general rule, "counsel's decision whether to call a witness falls within the rubric of trial strategy and will not be second-guessed by a reviewing court." *State v. Treesh*, 90 Ohio St.3d 460, 490 (2001). There are any number of reasons why Laws's third attorney might have elected to present the testimony of only one alibi witness. For example, with respect to the potential witness who might have had a warrant for his arrest, Laws's third attorney might have concluded that knowledge of the outstanding warrant would negatively affect the jury's assessment of his credibility. *See State v. Jones*, 8th Dist. Cuyahoga No. 81112, 2003-Ohio-3004, ¶ 28. Furthermore, as two names

appear on Laws's notice of alibi, the record reflects that Laws's third attorney originally intended to call two alibi witnesses. (*See* Doc. Nos. 109, 110). The fact that only one of these witnesses ultimately testified could be the product of Laws's third attorney's reasoned determination, after further investigation, that the other witness was not believable or that the witness whose testimony was presented could offer the most persuasive account of Laws's alibi. Ultimately, Laws's third attorney's reasons for calling only one alibi witness are not reflected in the record, and given the presumption of competent representation, we cannot conclude that Laws's third attorney's decision fell outside of the range of reasonable professional judgment.

{¶42} In his second claim of ineffective assistance of counsel, Laws argues that his third attorney, who represented him during his trial, was ineffective because he failed to secure the admission of "a telephone recording that would have cast doubt over [Wilson's] story." (Appellant's Brief at 18). The alleged recording is not part of the record. Instead, the supposed contents of the recording were entered into the record through the proffered testimony of Toccara Laws ("Toccara"), Laws's cousin. Toccara testified that she received a recording from Jones in which Wilson's mother can be heard telling Jones that "if she don't get the money[,] she's going to go to the police." (Dec. 10-11, 2019 Tr., Vol. II, at 321). According to Toccara, Jones can then be heard "say[ing] [that] she was going to get it." (*Id.*).

Laws faults his third attorney for attempting to use Toccara to introduce the alleged recording because Toccara "had nothing to do with the recording." (Appellant's Brief at 18). He argues that his third attorney should have asked Wilson about the recording and that he should have "call[ed] [Jones] or [Wilson's mother] to the stand to authenticate the recording and offer testimony about the recording, which was potentially exculpatory in nature." (*Id.*).

{¶43} For the sake of Laws's argument, we will assume that the recording exists, that Toccara accurately described the contents of the recording, and that, despite a multitude of relevancy and hearsay issues, the recording would have been admissible both as substantive evidence and for purposes of impeachment. We will also assume that Laws's third attorney rendered deficient performance by failing to ensure that the recording was admitted at trial. Even so, we cannot conclude that there is a reasonable probability that Laws's trial would have ended differently had the recording been admitted. Notably, Laws's arguments about the recording lack any reference to prejudicial effect, other than broad declarations that the recording would have "cast doubt" over Wilson's testimony and that the recording was "potentially exculpatory." Without more, conclusory statements such as these "are insufficient to find that counsel was ineffective." *State v. Line*, 3d Dist. Allen No. 1-19-07, 2019-Ohio-4221, ¶ 13, citing *State v. Gibson*, 78 Ohio App.3d 501 (10th Dist.1992). Regardless, we fail to see how admission of the recording would have

had a material effect on the outcome of Laws's trial. The recorded conversation does not, in any way, serve to negate any of the elements of any of the offenses of which Laws was convicted. Furthermore, since Wilson's mother, rather than Wilson, was the person heard demanding money from Jones, the recording would have been of limited value in impeaching Wilson's testimony. Finally, even if the recording could have been successfully used to impeach Wilson's testimony, Jones, the target of the apparent extortion scheme, also offered testimony that implicated Laws in the offenses, and Laws does not specify how the recording could have been used to undermine Jones's testimony. (*See* Dec. 10-11, 2019 Tr., Vol. I, at 179-180, 187-188). Accordingly, we cannot say that Laws suffered prejudice.

{¶44} In his third claim of ineffective assistance of counsel, Laws argues that his first three attorneys were ineffective because they failed to file any "substantive pretrial motions," specifically motions to suppress evidence. (Appellant's Brief at 18). This argument is without merit. "The failure to file a motion is not per se ineffective assistance of counsel." *State v. Costell*, 3d Dist. Union No. 14-15-11, 2016-Ohio-3386, ¶ 161, citing *State v. Schlosser*, 3d Dist. Union No. 14-10-30, 2011-Ohio-4183, ¶ 34, citing *In re Smith*, 3d Dist. Hancock No. 5-01-34, 2002 WL 255126, *6 (Feb. 22, 2002). "'Without proving that trial counsel was deficient for failing to make certain motions and that those motions had a reasonable probability of success, the ineffective assistance of counsel claim fails.'" *Id.*,

quoting *Schlosser* at ¶ 34. Here, although Laws faults his first three attorneys for failing to file certain pretrial motions, he makes no argument whatsoever as to whether any of these proposed motions had a reasonable probability of success. As a result, Laws's third claim of ineffective assistance fails.

{¶45} Laws's fourth claim of ineffective assistance of counsel is based on his contention that his third attorney failed to adequately prepare for trial. Laws argues that the 40 days that his third attorney had to prepare for trial "was clearly not enough time." (Appellant's Brief at 18). He observes that his third attorney did not file the notice of alibi in a timely fashion and that he did not notify the State until the second day of trial that Toccara would be offered as a witness. (*Id.*). He claims that had his third attorney "conducted a proper pretrial investigation and actually spent some time with [him]" before trial, his third attorney "would have had [Toccara's] name well before the trial date." (*Id.*).

{¶46} We find no merit in Laws's argument. The record belies Laws's claim that his third attorney's inadequate pretrial investigation led to his belatedly-filed notice of alibi and to the untimely notification of his intent to call Toccara as a witness. Although Laws once complained that he had not talked to his third attorney for longer than an hour at any one time in the weeks leading up to his trial, Laws nonetheless stated that he had "told [his] lawyer who [he] wanted as [his] witnesses." (Dec. 10-11, 2019 Tr., Vol. I, at 10-11). The record thus supports that,

in the limited time that he had before trial, Laws's third attorney spoke to Laws regarding the witnesses that Laws desired to present. Yet, at trial, Laws's third attorney indicated that he was not told about the identities of Laws's two potential alibi witnesses until less than a week before trial and that he was not informed about Toccara's proposed testimony until the morning of the second day of trial. (Dec. 10-11, 2019 Tr., Vol. I, at 3, 6); (Dec. 10-11, 2019 Tr., Vol. II, at 311, 315). This suggests that the late filings and notifications were attributable not to Laws's third attorney's lack of investigation but to Laws's last-second disclosures. Moreover, at least with respect to Laws's potential alibi witnesses, Laws was not prejudiced because the trial court permitted Laws to present his alibi witnesses notwithstanding the fact that his notice of alibi was filed less than seven days before trial. (Dec. 10-11, 2019 Tr., Vol. I, at 12); (Dec. 10-11, 2019 Tr., Vol. II, at 300).

{¶47} Laws "has the burden of demonstrating that his counsel rendered ineffective assistance by failing to conduct an adequate investigation." *State v. Jackson*, 141 Ohio St.3d 171, 2014-Ohio-3707, ¶ 212, citing *State v. Hunter*, 131 Ohio St.3d 67, 2011-Ohio-6524, ¶ 104, citing *Strickland*, 466 U.S. at 687. He has failed to point to anything in the record that affirmatively shows what his third attorney did or failed to do in preparation for trial. "Absent any indication in the record * * * that counsel failed to properly investigate the case and adequately prepare for trial and given the presumption of competent representation, we cannot

conclude that counsel's performance fell below an objective standard of reasonableness." *State v. Griffin*, 3d Dist. Allen No. 1-03-31, 2004-Ohio-287, ¶ 17.

{¶48} In Laws's fifth claim of ineffective assistance of counsel, Laws argues that his third attorney ineffectively cross-examined the State's witnesses. He argues that his third attorney did not "vigorously question" the witnesses and that "at no point did he try to establish [that] there was no theft, which was the basis of his Crim.R. 29 motion." (Appellant's Brief at 19). In addition, Laws maintains that his third attorney "did very little to challenge any of the scientific evidence presented," and he seems to fault his third attorney for relying solely on cross-examination to challenge the State's scientific evidence. (*Id.*).

{¶49} This claim is also without merit. "'The extent and scope of cross-examination clearly fall within the ambit of trial strategy, and debatable trial tactics do not establish ineffective assistance of counsel.'" *State v. Cooperstein*, 12th Dist. Warren No. CA2018-09-117, 2019-Ohio-4724, ¶ 29, quoting *State v. Leonard*, 104 Ohio St.3d 54, 2004-Ohio-6235, ¶ 146. Moreover, "it is generally a legitimate trial strategy for defense counsel not to present expert testimony and instead rely upon cross-examination of a state's expert to rebut evidence of a crime." *State v. Green*, 12th Dist. Warren No. CA2017-11-161, 2018-Ohio-3991, ¶ 43. Typically, then, "'the failure to call an expert and instead rely on cross-examination does not constitute ineffective assistance of counsel.'" *Cooperstein* at ¶ 27, quoting *Hunter*

at ¶ 66. While we do not want to give short shrift to Laws's arguments, after reviewing Laws's third attorney's cross-examination of the State's witnesses, we simply cannot find any basis for concluding that his cross-examination was professionally unreasonable. Laws's third attorney tried to draw out inconsistencies or contradictions in the testimonies of the State's witnesses where he could, and he posed informed questions to the State's scientific expert. Although the cross-examination may not have been as zealous or as probing as Laws wishes, it certainly was not tantamount to no cross-examination at all. Moreover, Laws once again fails to show, or even argue, that he was prejudiced. "Had [Laws's third attorney] asked more questions, there is no indication that the answers would have been helpful to [his] defense, or that further cross-examination would have resulted in * * * not-guilty verdict[s]." *Id.* at ¶ 29. Thus, with respect to his fifth claim, we conclude that Laws has failed to demonstrate that he received ineffective assistance of counsel.

{¶50} In Laws's sixth claim of ineffective assistance of counsel, Laws argues that his third attorney was ineffective in the presentation of the alibi defense and in the way that he attempted to introduce the audio recording. Specifically, Laws again critiques both the fact that his third attorney presented only one alibi witness and the fact that Toccara's testimony had to be proffered because she was not disclosed as a witness until the second day of trial. (Appellant's Brief at 19). He also renews

his argument that his third attorney was ineffective because he failed to use Wilson's mother or Jones to authenticate the audio recording and because he did not question Wilson's mother or Jones about the recorded conversation. However, we have already rejected these exact arguments in the context of Laws's first and second ineffective-assistance claims. Accordingly, we need not consider Laws's sixth claim any further.

{¶51} In his seventh claim of ineffective assistance of counsel, Laws argues that his third attorney's decision to waive opening and closing statements constituted ineffective assistance of counsel. We disagree. "It is widely established that the decision to make an opening or closing statement is considered a tactical decision or trial strategy, which does not rise to the level of ineffective assistance." *State v. Lawrence*, 3d Dist. Putnam No. 12-15-11, 2016-Ohio-2768, ¶ 37. While it might have been preferable for Laws's third attorney to make opening and closing statements, we cannot say that it was entirely outside the range of reasonable professional judgment. Laws's entire defense strategy was based on proving that he was not present at the apartment during the incident on December 2, 2018. It was a straightforward defense, which did not require clarification via thorough opening and closing statements. Although Laws's third attorney's decision to focus solely on Laws's alibi rather than putting some focus on potential deficiencies in the State's case might be a debatable trial tactic, it was not an obviously flawed decision.

Laws's third attorney's decision to forgo opening and closing statements was entirely consistent with the overall defense strategy. *See State v. Keith*, 79 Ohio St.3d 514, 537 (1997) (trial counsel's decision to forgo opening and closing statements in penalty phase of capital case was not unreasonable as it "complied with appellant's decision not to present mitigating evidence and comported with his claims of innocence"). In any event, Laws has failed to articulate precisely how he was prejudiced by his third attorney's decision to opt out of opening and closing statements. Accordingly, Laws's seventh claim of ineffective assistance of counsel fails as well.

{¶52} Finally, Laws argues that even if some of his claims of ineffective assistance of counsel fail on an individual basis, his first three attorneys' deficient conduct, when viewed cumulatively, deprived him of the effective assistance of counsel. Yet, we have for the most part determined that Laws's first three attorneys either did not render professionally deficient or unreasonable performance or that the record does not contain sufficient information to draw conclusions about the reasonableness of their performance. In only one instance did we assume deficient performance on the part of Laws's attorneys, and in that instance, we concluded that Laws failed to establish prejudice. In short, given the particular manner in which we resolved each of Laws's individual claims of ineffective assistance of counsel,

we have no basis for concluding that Laws's attorneys' purported deficiencies combined to deny Laws a fair trial.

{¶53} Laws's third assignment of error is overruled.

{¶54} Having found no error prejudicial to the appellant herein in the particulars assigned and argued, we affirm the judgment of the trial court.

*Judgment Affirmed*

**WILLAMOWSKI, P.J. and ZIMMERMAN, J., concur.**

**/jlr**